### MICHAEL W. MALCHIK v. DIVISION OF CRIMINAL JUSTICE ET AL.
### (SC 17016)

Sullivan, C. J., and Borden, Norcott, Vertefeuille and Zarella, Js.

Argued September 25—officially released December 9, 2003

*Ralph J. Monaco*, with whom were *Thomas J. Londregan* and, on the brief, *Patrick J. Day*, for the appellant (plaintiff).

*Jason M. Dodge*, with whom was *Kristen L. Frazier*, for the appellee (named defendant).

*Opinion*

NORCOTT, J. The plaintiff, Michael W. Malchik, appeals[1] from the decision of the workers' compensation review board (board) affirming a decision of the workers' compensation commissioner for the second district (commissioner) denying compensation for the plaintiff's coronary artery disease. The principal issue in this appeal is whether the board properly affirmed the commissioner's determination that the plaintiff's coronary artery disease did not constitute an occupational disease as defined by General Statutes § 31-275 (15)[2] and, therefore, his notice of claim was not subject to the three year limitation period set forth in General Statutes § 31-294c.[3] In addition, the plaintiff claims that his notice of claim was timely under the one year limitation period set forth in § 31-294c for accidental and repetitive trauma injuries. Specifically, the plaintiff contends that his notice of claim was timely because: (1)

---

[1] The plaintiff appealed from the decision of the workers' compensation review board to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 31-275 (15) provides: " 'Occupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment."

[3] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be . . . ."

he was an employee of the state[4] beyond the date of his retirement, September 30, 1998, due to his assistance on the retrial of the penalty phase of the Michael Ross[5] case; (2) his assistance to the state constituted additional exposure to incidents of repetitive trauma beyond September 30, 1998; and (3) he was incapacitated for several weeks after his retirement, thereby tolling the one year limitation period for an equivalent amount of time. We reject the plaintiff's claims, and, therefore, we affirm the decision of the board.

The following facts and procedural history are relevant to our resolution of this appeal. After graduating from high school and working for Southern New England Telephone Company for two years, the plaintiff joined the Waterford police department as a supernumerary officer. The plaintiff eventually was promoted to patrolman, and then detective. He joined the state police department in March, 1970, yet left in February, 1971, for private employment. In May, 1974, the plaintiff returned to employment with the state police, where he was placed on highway patrol and investigated accidents and motor vehicle violations. After two years as a state police trooper, the plaintiff was accepted into the criminal investigation unit, where he worked for seven years investigating crimes up to and including

---

[4] The defendants involved in the commissioner's decision included the state division of criminal justice, the state department of public safety and state police, Berkley Administrators, O'Hanlon Reports, Inc., Reliance Insurance Company, Litigation Support Services, the Waterford police department, and United States Fidelity and Guaranty Company. On appeal to this court, the defendants are the state division of criminal justice, the state department of public safety and state police, and Ace Financial Solutions. They will be referred to collectively as the defendants, and, where appropriate, individually by name.

[5] See State v. Ross, 230 Conn. 183, 191, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (affirming conviction of all counts of capital felony, but "revers[ing] the judgments with imposing the death penalty and remand[ing] for new sentencing hearings on all counts").

class A felonies. During that time, the plaintiff investigated between 90 to 100 homicides, including the serial homicides committed by Ross, and the plaintiff visited many nonhomicide death scenes.

In 1989, the plaintiff retired from the state police, entered law school, and operated a business known as Litigation Support Services. After graduating from law school in 1993, the plaintiff returned to employment with the state division of criminal justice as an inspector in the New London state's attorney's office. After being laid off for eight weeks in 1998, the plaintiff once again returned to employment with the state's attorney's office, working as an inspector for both the New London office and the chief state's attorney's office. The plaintiff retired from employment with the state in 1998, and his application for retirement benefits listed his last date of employment as September 30, 1998.

In 1999, the plaintiff began to experience chest pain, and ultimately he went to a cardiologist. The cardiologist, who diagnosed the plaintiff as having multiple risk factors for coronary disease, prescribed medication, and recommended cardiac catheterization. After additional testing, the plaintiff was admitted to Yale-New Haven Hospital on October 8, 1999, where he underwent an angioplasty and had a stent[6] implanted in his left anterior descending coronary artery. The plaintiff was discharged from the hospital on October 12, 1999, and he filed a notice of claim for compensation with the defendants on November 5, 1999. His notice claimed that his coronary artery disease was caused by his twenty-one years of hazardous duty in state employment. The defendants timely disclaimed liability for the plaintiff's disease.

---

[6] The American Heritage Stedman's Medical Dictionary (1995) defines the term stent as a "slender thread, rod, or catheter placed within the lumen of tubular structures to provide support during or after anastomosis."

The commissioner found that the plaintiff had "introduced no credible evidence that would support his claim that his cardiac condition was a disease peculiar to his occupation and due to hazards in excess of employment. Therefore, his cardiac condition does not constitute an occupational disease within the meaning of the Workers' Compensation Act." In addition, the commissioner rejected the plaintiff's claims that he was employed by the state or exposed to repetitive trauma beyond September 30, 1998, and that he was incapacitated for a period of time following his retirement, thereby tolling the applicable limitation period.

The plaintiff appealed from the commissioner's decision to the board, which affirmed the commissioner's decision. The board subsequently denied the plaintiff's motion for remand or for the taking of additional evidence. This appeal followed.

I

The plaintiff first claims that the commissioner improperly determined that the plaintiff's coronary artery disease was not an " '[o]ccupational disease' " under § 31-275 (15). The defendants contend, to the contrary, that the commissioner properly determined that the plaintiff had presented insufficient evidence to show that his coronary artery disease was an occupational disease. We agree with the defendants.

As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. Filing "a notice of claim or . . . satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions whether the commission[er] has subject matter jurisdiction under the [Workers' Compensation] [A]ct." (Internal quotation marks omitted.) *Kuehl* v. *Z-Loda Systems Engineering, Inc.*, 265 Conn. 525, 534, 829 A.2d 818 (2003); *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 5–6, 675 A.2d 845

(1996). "[B]ecause [a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999); *Anastasio* v. *Mail Contractors of America, Inc.*, 69 Conn. App. 385, 392, 794 A.2d 1061, cert. denied, 261 Conn. 914, 915, 806 A.2d 1053 (2002).

Section 31-275 (15) defines " '[o]ccupational disease' " as "any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment."

"In interpreting the phrase occupational disease, we have stated that the requirement that the disease be peculiar to the occupation and in excess of the ordinary hazards of employment, refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted. *Hansen* v. *Gordon*, 221 Conn. 29, 35, 602 A.2d 560 (1992). Thus, an occupational disease does not include a disease which results from the peculiar conditions surrounding the employment of the claimant in a kind of work which would not from its nature be more likely to cause it than would other kinds of employment carried on under the same conditions. *Madeo* v. *I. Dibner & Bro., Inc.*, 121 Conn. 664, 667, 186 A. 616 (1936)." (Internal quotation marks omitted.) *Crochiere* v. *Board of Education*, 227 Conn. 333, 352–53, 630 A.2d 1027 (1993). In the present case, the facts fail to demonstrate that the plaintiff's coronary

artery disease is "peculiar to" and "so distinctively associated with [criminal investigators and police officers] that there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Hansen* v. *Gordon*, supra, 35.

The commissioner found that the plaintiff offered "no credible evidence" tying coronary artery disease to his occupation. The board agreed with the commissioner's review of the evidence, and determined that "[t]he trial commissioner therefore had no basis upon which to make a finding that stress should be considered an occupational disease for either police officers or criminal investigation specialists working within the law enforcement system, and we find no error in that regard on appeal." Although the record reveals that the plaintiff offered evidence to prove that he *personally* suffered coronary artery disease as a result of stress from his job,[7] he failed to offer evidence that this stress and resulting disease were "peculiar to" or so "distinctively associated with the [the plaintiff's] occupation that

---

[7] For example, the plaintiff claims that "[t]here is ample evidence—direct, circumstantial and anecdotal—demonstrating that [the plaintiff's] heart disease was causally related to workplace stress." This may be true as it regards the *causation* of the plaintiff's coronary artery disease. It does not, however, necessarily prove that the plaintiff's coronary artery disease qualifies as an occupational disease for purposes of extending the limitation period for bringing a workers' compensation claim. See *Hansen* v. *Gordon*, supra, 221 Conn. 38 (affirming award "because the claimant has proven that [hepatitis type B virus (HBV)] arose out of and in the course of her employment, *and* that HBV is an occupational disease for a dental hygienist" [emphasis added]). Furthermore, a letter from the plaintiff's cardiologist stated that "[the plaintiff] has always taken his job very, very seriously, and it has always been quite stressful to him. It is clear that stress is directly associated with coronary artery disease and angina. I feel that the majority of [the plaintiff's] stress was job-related from his long years as a police officer." This letter, although suggesting that his disease was the result of his individual approach to his job, does not mandate a finding that coronary artery disease is so distinctly associated with the plaintiff's occupation as to qualify as an occupational disease.

there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Hansen* v. *Gordon,* supra, 221 Conn. 35.[8] Accordingly, we conclude that the board properly affirmed the decision of the commissioner that the plaintiff did not prove that his coronary artery disease was an occupational disease.

This conclusion is bolstered by an examination of prior cases in which this court has concluded that a claimant's disease was not an occupational disease under the Workers' Compensation Act. See, e.g., *Discuillo* v. *Stone & Webster,* 242 Conn. 570, 579, 698 A.2d 873 (1997) (painter could not claim heart attack as occupational disease because both mental and physical stresses of painting were no more likely to cause heart attack than other kinds of employment under same circumstances); *Crochiere* v. *Board of Education,* supra, 227 Conn. 353 (teacher could not claim mental injury as occupational disease where injury was based on false charges of sexual misconduct because such allegations "could arise in numerous occupational settings"); *Madeo* v. *I. Dibner & Bro., Inc.,* supra, 121 Conn. 668 (although plaintiff's tuberculosis resulted from unsanitary conditions of her particular employment in factory, it was not occupational disease because any occupation conducted under specific conditions at that factory, "which never should have been permitted

---

[8] The plaintiff interprets this language from *Hansen* as requiring only a showing of proximate cause between the disease and the plaintiff's job. This interpretation is mistaken, however, because the *Hansen* language requires a showing of proximate cause *between the duties of the occupation* and the plaintiff's disease. The term *"occupational* disease" alone demonstrates that the analysis is focused on more than just the plaintiff's situation, as would be the case in the analysis of an *accidental* or *repetitive trauma* case. In both of those situations, the commissioner examines the individual job and activities of the plaintiff in order to determine if the injury is compensable. With *occupational* diseases, however, the inquiry is much broader, and encompasses an analysis of conditions "peculiar to" *the plaintiff's occupation.*

to exist," would have caused disease); compare *Hansen* v. *Gordon*, supra, 221 Conn. 38 (expert testimony demonstrated that general work conditions and employment duties of dental hygienists put them at significantly increased risk of contracting hepatitis type B virus).

The plaintiff, however, cites to General Statutes §§ 5-145a[9] and 5-145c[10] as evidence that his coronary artery disease is an occupational disease of investigators.[11] Specifically, the plaintiff claims that the commissioner improperly ignored the presumptions created by these statutes and, therefore, improperly found that the plaintiff presented no credible evidence that his coronary artery disease was an occupational disease. We disagree.

---

[9] General Statutes § 5-145a provides in relevant part: "Any condition of impairment of health caused by hypertension or heart disease resulting in total or partial disability or death to . . . any detective, chief inspector or inspector in the Division of Criminal Justice . . . who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of such condition, shall be presumed to have been suffered in the performance of his duty and shall be compensable in accordance with the provisions of chapter 568 [Workers' Compensation Act], except that for the first three months of compensability the employee shall continue to receive the full salary which he was receiving at the time of injury in the manner provided by the provisions of section 5-142. . . ."

[10] General Statutes § 5-145c provides: "Any condition of impairment of health caused by hypertension or heart disease resulting in total or partial disability or death to any chief inspector or inspector in the Division of Criminal Justice who had successfully passed a physical examination on entry into prior service in any state or municipal police department, which examination failed to reveal any evidence of such condition, shall be presumed to have been suffered in the performance of his duty as a chief inspector or inspector in the Division of Criminal Justice. Nothing herein shall be construed to affect the application of chapter 568 to such person."

[11] The plaintiff cites two additional statutes in support of his claim, yet these statutes apply to different professions. See General Statutes § 7-433c (providing rebuttable presumption of causation to "a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department"); General Statutes § 29-4a (providing rebuttable presumption of causation for "a member of the Division of State Police within the Department of Public Safety").

Both §§ 5-145a and 5-145c provide that hypertension or heart disease "shall be presumed to have been suffered in the performance of [the inspector's] duty . . . ." The presumptions created by those statutes may be rebutted by sufficient and persuasive evidence to the contrary. *Salmeri* v. *Dept. of Public Safety*, 70 Conn. App. 321, 339, 798 A.2d 481, cert. denied, 261 Conn. 919, 806 A.2d 1055 (2002). These rebuttable presumptions apply only to the question of causation, however, and not to the jurisdictional question of whether a disease is an occupational disease subject to the three year limitation period set forth in § 31-294c.[12] See *Ducharme* v. *Putnam*, 161 Conn. 135, 142–43, 285 A.2d 318 (1971) ("[i]t is not without significance that although many states have recognized the special situation of firemen and policemen, and the problems of proving *a causal relationship* between their employment and heart ailments and have provided special treatment for them in the nature of rebuttable presumptions, *as to causation*, no other state appears to have successfully attempted by legislative fiat and conclusive presumption to bar the employer from attempting to prove the negative fact that in a contested case the heart ailment was not *causally connected* with the employment" [emphasis added]).

Section 5-145c explicitly states that "[n]othing herein shall be construed to affect the application of chapter 568 to such person," while § 5-145a states that a claim "shall be compensable in accordance with the provisions of chapter 568 . . . ." Accordingly, both §§ 5-145a and 5-145c require a claimant to comport with

---

[12] In addressing a similar statute, the Appellate Court stated that "[§] 7-433c was not intended to provide its beneficiaries with dual dollar benefits, but to eliminate two of the basic requirements for coverage under the Workers' Compensation Act, namely the causal connection between hypertension and heart disease and the employment, and the requirement that the illness was suffered during the course of employment." *Salmeri* v. *Dept. of Public Safety*, supra, 70 Conn. App. 331.

the jurisdictional and procedural requirements of the Workers' Compensation Act before their presumptions become applicable to an analysis of causation. We take this opportunity to reemphasize that "[c]ompliance with [§ 31-294c] is essential to maintaining a claim for compensation under chapter 568 and therefore under [General Statutes] § 7-433c[13] [and §§ 5-145a and 5-145c] because timely notice is a jurisdictional requirement that cannot be waived." *Collins* v. *West Haven*, 210 Conn. 423, 430, 555 A.2d 981 (1989); see also *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 577 ("for a commissioner to have jurisdiction over a claim, that claim must fit within the existing jurisdictional provisions of [§ 31-294c]").

---

[13] General Statutes § 7-433c (a) provides in relevant part: "Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. . . . The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. . . ."

Furthermore, with respect to both § 7-433c and §§ 5-145a and 5-145c, the underlying legislative purpose was social rather than medical. More specifically, the legislature's intent was to afford the named occupations with a bonus by way of a rebuttable presumption of compensability when, under the appropriate conditions, the employee suffered heart disease or hypertension. See, e.g., *Carriero* v. *Naugatuck*, 243 Conn. 747, 754, 707 A.2d 706 (1998) (payments pursuant to § 7-433c constitute " 'special compensation, or even an outright bonus, to qualifying policemen and firemen' "). That does not mean, however, as the plaintiff's argument suggests, that the legislature also intended to afford those occupations with the additional benefit resulting from a declaration of heart disease and hypertension as an occupational disease. This conclusion is buttressed by our recognition that, although occupational disease has long been a recognized concept in workers' compensation law, the legislature has not included heart disease or hypertension within that concept.

The case of *Zaleta* v. *Fairfield*, 38 Conn. App. 1, 658 A.2d 166, cert. denied, 234 Conn. 917, 661 A.2d 98 (1995), provides additional instruction to the resolution of this claim. In that case, "[t]he plaintiff . . . relied *only* on the language of § 7-433c, claiming that it evinces legislative recognition of heart disease and hypertension as occupational diseases vis-a-vis police officers and firefighters." (Emphasis added.) Id., 7. After a thorough analysis of the legislative history of § 7-433c,[14] the Appel-

---

[14] Specifically, the Appellate Court noted: "The statute concerning heart disease and hypertension was originally drafted as part of the Workers' Compensation Act and provided police officers and firefighters with a rebuttable presumption that heart disease and hypertension were causally connected to their occupations. *Morgan* v. *East Haven*, 208 Conn. 576, 580, 546 A.2d 243 (1988). In 1969, this rebuttable presumption was made conclusive and the statute was soon declared unconstitutional in *Ducharme* v. *Putnam*, 161 Conn. 135, 143, 285 A.2d 318 (1971). In response to that problem, § 7-433c was enacted in its present form in 1977 as legislation separate and distinct from the Workers' Compensation Act. *Morgan* v. *East Haven*, supra, 581.

late Court concluded that "[t]he [board], therefore, had *no evidence* before it that hypertension is an occupational disease and its finding that the plaintiff's claim was subject to the three year statute of limitations cannot stand." (Emphasis added.) Id., 8.[15] Because of the similarities between § 7-433c and §§ 5-145a and 5-145c,

"The fact that the constitutionality of § 7-433c as class preference legislation was upheld by [our Supreme Court] in . . . *Grover* v. *Manchester*, 168 Conn. 84, 357 A.2d 922, appeal dismissed, 423 U.S. 805, 96 S. Ct. 14, 46 L. Ed. 2d 26 [1975], as serving a proper public purpose, does not compel a conclusion that the statute implicitly includes an affirmative legislative finding of work-relatedness in all cases. *Plainville* v. *Travelers Indemnity Co.*, [178 Conn. 664, 673, 425 A.2d 131 (1979)]. In fact, our courts have consistently held that § 7-433c is not an occupational disease law. As stated in *Plainville* v. *Travelers Indemnity Co.*, supra, 673: Although the preamble to . . . § 7-433c indicates a legislative recognition of the risks to which policemen and firemen are exposed, including an unusual high degree of susceptibility to heart disease and hypertension, we do not construe such language as the equivalent of a legislative finding that all heart ailments suffered by firemen and policemen are causally related to their employment as the plaintiff seems to suggest." (Internal quotation marks omitted.) *Zaleta* v. *Fairfield*, supra, 38 Conn. App. 7–8.

[15] After the board issued its decision in the present case, the plaintiff filed a motion to remand or for the taking of additional evidence. The board denied this motion. In a footnote to his brief, the plaintiff claims that the board erred in denying that motion, and that denial forms the basis for reversal on appeal. Because the plaintiff did not appropriately raise this issue, we will not address the propriety of the board's actions.

In addition, the plaintiff attempts to characterize the commissioner's decision as "establish[ing] a new requirement" that claimants present "opinion evidence from a qualified vocational or other appropriate expert concerning the risks and hazards particular to the specific occupation." We do not agree. The commissioner's decision merely found that, in the present case, the plaintiff failed to meet his burden of showing that his coronary artery disease was an occupational disease of police officers and investigators. The determination of whether the evidence presented, in whatever form, demonstrates the existence of an occupational disease rests with the commissioner, subject to applicable forms of appellate review. We do note, however, that despite the plaintiff's claim, many prior cases involving occupational diseases have featured expert testimony. See, e.g., *Hansen* v. *Gordon*, supra, 221 Conn. 37 n.3 ("claimant's treating physician . . . [as well as] a professor at the University of Connecticut dental school, and . . . the employer's expert, a physician specializing in internal medicine and gastroenterology, all testified that dental professionals are at an increased risk to contract [hepatitis type B virus]").

we see no principled reason why the sound reasoning of *Zaleta* should not apply to §§ 5-145a and 5-145c and the facts of the present case.

II

The plaintiff next claims, as an alternate ground for reversing the board's decision, that his notice of claim was timely under the one year limitation period applicable to accidental and repetitive trauma injuries. Specifically, the plaintiff claims that his notice of claim was timely because: (1) he was an employee of the state beyond September 30, 1998, due to his assistance on the retrial of the penalty phase of the Ross case; (2) his assistance to the state constituted additional exposure to incidents of repetitive trauma beyond September 30, 1998; and (3) he was incapacitated for several weeks after his retirement, thereby tolling the one year limitation period for an equivalent amount of time. We disagree.

"The principles that govern our standard of review [of these claims] are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Neither the review board nor this court has the power to retry the facts." (Citation omitted; internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 797–98, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

A

The plaintiff first claims that the commissioner improperly found that the plaintiff's last date of employment was September 30, 1998. Specifically, the plaintiff contends that he "acted as an employee of the State

during the Ross retrial," from January, 1999, until April, 2000, thereby extending the limitation period. The defendants contend that the commissioner properly determined that the plaintiff's last day of employment was September 30, 1998. We agree with the defendants.

"[T]here is no dispute about the ultimate test [for deciding whether a worker is an employee under the Workers' Compensation Act]. It is the right of general control of the means and methods used by the person whose status is involved." (Internal quotation marks omitted.) *Hanson* v. *Transportation General, Inc.*, 245 Conn. 613, 617, 716 A.2d 857 (1998); *Ross* v. *Post Publishing Co.*, 129 Conn. 564, 567, 29 A.2d 768 (1943).

The following additional facts are relevant to our resolution of this claim. Specifically, the commissioner found that the plaintiff's application for retirement benefits listed his last date of employment with the state as September 30, 1998. After October 1, 1998, the state hired John Edwards, an investigator, to help prepare for the retrial of the penalty phase of the Ross case. Subsequently, Edwards asked the plaintiff for help in preparing the case. The plaintiff's help consisted of: (1) going to the New London state's attorney's office for meetings that were primarily arranged at the plaintiff's convenience; and (2) reviewing a notebook of his original trial testimony. In addition, the commissioner found that: (1) the plaintiff, although he requested pay, was never paid for his services; (2) no one from the state exercised direction or control over the plaintiff's activities; (3) no performance reviews were ever filed on the plaintiff's activities; (4) no one from the state tracked the plaintiff's mileage records or reports, or sent him directives on office policies and procedures; and (5) there was no personal services agreement between the state and the plaintiff.[16] The commissioner properly

---

[16] As the board noted in its decision, there was testimony that the division of criminal justice cannot rehire a retired individual without the execution

determined that the plaintiff was not employed for pur-
poses of the Workers' Compensation Act beyond Sep-
tember 30, 1998.

B

The plaintiff's next claim is that, even if he was not
an employee of the state beyond September 30, 1998,
his assistance on the retrial of the penalty phase of the
Ross case constituted additional work-related incidents
of repetitive trauma, thereby extending the one year
limitation period. We disagree.

Claims of injuries resulting from cases of repetitive
trauma are subject to the same one year limitation
period as claims for accidental injuries. *Discuillo* v.
*Stone & Webster*, supra, 242 Conn. 581. In the present
case, the commissioner found that "[t]he last time that
[the plaintiff] could have been exposed to work related
stress was on his last date of employment with [the
state] on September 30, 1998." The plaintiff, however,
maintains that our decisions in *Crochiere* and *Discuillo*
stand for the proposition that exposure to repetitive
trauma can occur after the termination of an employ-
ment relationship. We disagree.

In *Crochiere*, this court stated that "in repetitive
trauma cases, it is settled law that the date of injury is
the last day of exposure to the work related incidents
of repetitive trauma, or the last day worked, whichever
is later." *Crochiere* v. *Board of Education*, supra, 227
Conn. 354. Subsequently, in *Discuillo*, we clarified that
"our dicta in *Crochiere* . . . to the effect that the final
date of a claimant's employment has independent signif-
icance, was an incorrect application of board prece-
dent." *Discuillo* v. *Stone & Webster*, supra, 242 Conn.
581 n.11. This court also emphasized that "although the

of a personal services agreement. Although such an agreement was issued
for Edwards, no such agreement was issued for the plaintiff.

last day of a claimant's exposure to a repetitive trauma often coincides with the last day of the claimant's employment . . . the former is the sole germane date for calculating the limitation period on a claim." (Citation omitted.) Id.

The plaintiff interprets *Discuillo* as stating that the last day of exposure can come either before or after the termination of employment. That interpretation is incorrect. Implicit in *Discuillo* was the recognition that, although exposure to work-related incidents of repetitive trauma can cease *before* a claimant's employment does,[17] work-related incidents of repetitive trauma cannot occur *after* a claimant's employment ceases. As we stated in *Crochiere*, "the date of injury is the last day of exposure to the *work related* incidents of repetitive trauma . . . ." (Emphasis added.) *Crochiere* v. *Board of Education*, supra, 227 Conn. 354. Furthermore, it is axiomatic that "[t]he Workers' Compensation Act . . . provides benefits only for those workers who have the status of 'employees' at the time of their injury." *Hanson* v. *Transportation General, Inc.*, supra, 245 Conn. 614; see also *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 572 (day of painter's heart attack was also last day of employment); *Crochiere* v. *Board of Education*, supra, 354 (plaintiff's last day of exposure to repetitive trauma was also last day of employment). In the present case, the plaintiff's last date of employment was September 30, 1998, and the plaintiff, therefore, could not have been exposed to any additional "work related incidents of repetitive trauma" beyond that date. *Crochiere* v. *Board of Education*, supra, 354.

---

[17] For example, a police officer could be removed from his or her normal patrols and duties, and be permanently assigned to a desk job. In that situation, the officer would be removed from potential sources of repetitive trauma, such as homicide scenes and ongoing criminal activities, yet still be employed. In that case, as we discussed in *Discuillo*, the last date of exposure to the sources of repetitive trauma would be the germane date for calculating the limitation period on a claim.

## C

Lastly, the plaintiff claims that the commissioner improperly found that the plaintiff was not incapacitated for a period of time following September 30, 1998, thereby tolling the one year limitation period. Specifically, the plaintiff claims that, from September 28, 1999, until November 17, 1999, he was tending to his immediate and urgent medical needs, and was thus incapacitated from filing a notice of claim. We disagree.

The commissioner properly found that the plaintiff "failed to introduce any credible evidence that would support his contention that he was incompetent during the one year following his retirement from [s]tate service on September 30, 1998." Furthermore, this court consistently has held that "[i]t is clear that an administrative body must act strictly within its statutory authority, within its constitutional limitations and in a lawful manner. *Waterbury* v. *Commission on Human Rights & Opportunities*, 160 Conn. 226, 230, 278 A.2d 77 (1971)." (Internal quotation marks omitted.) *Marone* v. *Waterbury*, 244 Conn. 1, 16, 707 A.2d 725 (1998). "Because of the statutory nature of our workers' compensation system, policy determinations as to what injuries are compensable and what jurisdictional limitations apply thereto are for the legislature, not the judiciary or the board, to make." *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 577.

As the board noted, the plaintiff has failed to identify any authority that would allow the commissioner to extend the limitation periods past the periods set forth in § 31-294c (a) in situations where the plaintiff is incapacitated.[18] Accordingly, we conclude that the commis-

---

[18] For example, § 31-294c provides exceptions to the limitation period, none of which the plaintiff has claimed is applicable here. None of these exceptions mention a tolling of the limitation period due to a claimant's incapacity. Further, this court has rejected similar arguments in the past. See *Kuehl* v. *Z-Loda Systems Engineering, Inc.*, supra, 265 Conn. 537 (rejecting claim that savings provision of § 31-294c [c] applied to plaintiff's

sioner properly found that the plaintiff was not incapacitated for purposes of tolling the one year limitation period set forth in § 31-294c.

The decision of the board is affirmed.

In this opinion the other justices concurred.

failure to file notice of claim); *Discuillo* v. *Stone & Webster,* supra, 242 Conn. 582 ("our precedent explicitly holds that, given the absence of such language, the limitation period for a claim based on accidental injury, is *not* tolled simply because the claimant is unaware that he or she has suffered a compensable injury" [emphasis in original]).